IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**NELSON DRIVER;**
**THERESA DRIVER;**
**and ARKANSAS RISK AND**
**INSURANCE SERVICES, INC.**                                              **PLAINTIFFS**

V.                              CASE NO: 5:22-CV-05049

**JOSEPH WOOD, individually and**
**in his capacity as Washington County,**
**Arkansas, County Judge;**
**BRIAN LESTER, individually and**
**in his capacity as Washington County,**
**Arkansas, County Attorney and Chief of Staff;**
**and WASHINGTON COUNTY, ARKANSAS**                                       **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This case was brought by a former contractor for Washington County, Arkansas, who claims that the County terminated the parties' contract in violation of its terms and in retaliation for the contractor's political speech. Before the Court are the Motion for Summary Judgment and accompanying briefing (Docs. 18, 19, 20) filed by Defendants Joseph Wood, Brian Lester, and Washington County, Arkansas, and a Response in Opposition and accompanying briefing (Docs. 24 & 25) filed by Plaintiffs Nelson Driver, Theresa Driver, and Arkansas Risk and Insurance Services, Inc. For the reasons stated below, Defendants' Motion for Summary Judgment (Doc. 18) is **GRANTED IN PART AND DENIED IN PART**.

### I. BACKGROUND

The following undisputed facts are taken from the 2017 Consulting Contract ("the Contract") (Doc. 2, pp. 13–16) between Arkansas Risk and Insurance Services, Inc. ("ARIS") and Washington County; the depositions of Theresa Driver, Nelson Driver, Brian

Lester, Joseph Wood, and Jennifer Hinkle (Docs. 20-1, 20-2, 20-3, 20-4, 25-3); the affidavit by Nelson Driver (Doc. 25-1); the declaration of Eva Madison (Doc. 25-2); and other uncontroverted evidence in the record.

Plaintiff Nelson Driver is the sole shareholder of ARIS, an S corporation. ARIS provides consulting services related to risk management, insurance, and workers' compensation. In 2000, Washington County Judge Jerry Hunton[1] contracted with ARIS to advise the County and address solvency issues with the County's health insurance program. The contract between the County and ARIS—signed by Judge Hunton and Nelson Driver—was for one year, and the agreement was re-signed each successive year. In 2009, County Judge Marilyn Edwards replaced Judge Hunton, and she continued engaging ARIS's services. In 2014, Judge Edwards and ARIS signed a new agreement that included an automatic renewal provision, which stated that the contract would renew each year unless the parties agreed otherwise.

In 2016, Joseph Wood, a Republican, was elected to a two-year term as County Judge. That same year, Arkansas voters amended the state constitution to provide for four-year county judge terms going forward. Wood appointed Brian Lester as the County Attorney, and Lester later become Wood's Chief of Staff as well.

On January 3, 2017, just as Wood began his first term in office, he and Nelson Driver, on behalf of ARIS, executed the Contract at issue in this lawsuit. The Contract obligated ARIS to continue to advise the County on its risk management and insurance programs. The County agreed to "make available to Consultant all necessary information concerning County's current insurance and risk programs." (Doc. 2, p. 13). The County

---

[1] In Arkansas, a county judge is the county's chief executive officer.

2

agreed to pay ARIS $2,300 on the 15th day of each month. Section 1(f) provides that either party's "default from any obligation herein . . . shall be grounds for termination of this contract" if the default is not cured within ten business days. *Id.* at p. 14. Section 1(g) defines the term of the agreement and includes an automatic renewal provision:

> The term of this contract shall be from January 1, 2017 through December 31, 2017. However, is shall renew annually and automatically and include any pay increases approved by the Quorum Court, unless agreed to otherwise by the parties.

*Id.* (all errors in original). Nelson drafted the Contract, basing it on the prior agreements between ARIS and the County. Those prior agreements were originally created by the Washington County Attorney.

The 2017 Contract was nearly identical to the 2014 agreement, but one sentence was removed in the newer version: "Either party may terminate this contract for any reason upon thirty (30) days notice." (Doc. 20-5, p. 2). The effect of this deletion was that if each side performed as promised, the 2017 Contract could only be terminated upon their mutual agreement. In addition, the word "it" in Section 1(g) of the 2014 Contract was changed in the 2017 version to the nonsensical "is." *See* Doc. 2, p. 14 ("However, *is* shall renew annually and automatically . . . .") (emphasis added).

In 2018, Wood ran for and won reelection to a four-year term against Democrat Jim House. In October 2018, just before the election, House's campaign Facebook page posted about a campaign mailout. Nelson's wife, Theresa Driver, commented on the post expressing her and Nelson's support for House, and County Attorney Lester responded that it was "[g]ood to know . . ." that the Drivers supported House. Below is a screenshot of Theresa and Lester's exchange.

3



(Doc. 2, p. 16). According to the declaration of Eva Madison, a former Justice of the Peace of Washington County, Madison responded to Lester that she was "Following and paying attention . . .," to which Lester, in a now-deleted reply, stated, "to what? You told me in January 2017 that the Judge needed to get rid of Nelson . . . ." (Doc. 25-2, ¶ 5).

Lester testified at his deposition that Theresa and Nelson's support for House was "good to know" because "when it comes to especially what all that has transpired over the years in county government . . . [y]our guard's always up on, you know, people that you think have your back versus people that may not have your back type thing." (Doc. 20-3, pp. 46–47).

Nelson interpreted Lester's comments as a threat against his contract with the County due to his support for Wood's opponent. Theresa decided not to respond further to Lester or anyone else in the Facebook comment thread because she "felt like any other

comments [that] might be taken from that . . . could be detrimental . . . or used." (Doc. 20-1, p. 21).

In January 2019, as Wood began his second term, the County failed to pay ARIS on the 15th of the month, as required by the Contract. Nelson's attorney sent a letter to the County demanding payment, and the County complied. This same sequence happened again in January 2020.[2] Nelson also alleges that County employees, under the direction of Lester, denied him access to information he needed to complete his duties.

In late 2021 or early 2022, Lester proposed a new contract to ARIS. The new contract was similar to the existing contract but added a provision allowing either party to unilaterally terminate the agreement. Nelson declined to sign the new contract because he was happy with the existing agreement.

Starting in January 2022, the County stopped paying ARIS under the existing 2017 Contract but did not explicitly inform ARIS or Nelson that the Contract was being terminated. The County also engaged another firm to provide insurance and risk management consulting to the County. After not being paid for three months, Plaintiffs filed this lawsuit in March 2022. On November 8, 2022, Patrick Deakins was elected to replace Wood as Washington County Judge and began his term in January 2023.

Count I of the Complaint (Doc. 2) brings claims on behalf of Nelson and Theresa under 42 U.S.C. §§ 1981[3] and 1983 for First Amendment retaliation against the County,

---

[2] These dates come from Nelson's deposition testimony. Defendants' Statement of Facts lists the dates of missed payments as January 2018 and January 2019, rather than 2019 and 2020. *See* Doc. 20, ¶ 9. The difference is immaterial.

[3] 42 U.S.C § 1981—which guarantees, among other things, "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens"—relates to racial discrimination and is not applicable in this free speech and breach of contract case.

5

Wood, and Lester.[4] Specifically, the Complaint alleges that "Nelson and Theresa's Constitutionally protected support for Jim House was a motivating factor in the Defendants' decision to cease payment under the contract." *Id.* at ¶ 27. Count II of the Complaint brings companion claims under the Arkansas Civil Rights Act ("ACRA") for violations of Nelson and Theresa's free speech and association rights under the Arkansas State Constitution. In Count III, ARIS brings a claim for breach of contract against the County. Plaintiffs seek economic damages under §§ 1981 and 1983 and the ACRA, injunctive relief to prevent future retaliation by the County, damages for breach of contract, and attorney's fees and costs.

Defendants' Motion for Summary Judgment argues that (1) Nelson and Theresa lack standing because they were not parties to the Contract; (2) Wood and Lester are entitled to qualified immunity for all individual-capacity claims against them; (3) Plaintiffs fail to show that the County maintained an unconstitutional policy or custom with respect to the free speech rights of its employees and contractors; and (4) ARIS's breach of contract claim fails because the relevant provision contains a typo and the Contract is void for illegality and is contrary to public policy.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in

---

[4] The Complaint names Wood and Lester in their individual and official capacities. Because Washington County is also a named defendant, the official-capacity claims against Wood and Lester are redundant. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

6

the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). In order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III. DISCUSSION

#### A. Standing

Under Article III of the United States Constitution, federal courts can only decide actual "Cases" and "Controversies" between two or more parties. U.S. Const. art. III, § 2, cl. 1. Therefore, to have standing to sue, a plaintiff must show "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which [federal courts] so largely depend[] for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). "To establish standing, the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 887 (8th Cir. 2021) (cleaned up). "The party invoking federal jurisdiction bears the burden of establishing these elements," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008). Additionally, under prudential standing principles, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, [the Supreme Court] has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Defendants argue Plaintiffs lack standing to bring claims under § 1983 and the ACRA because "Plaintiffs Nelson Driver and ARIS were not parties to the allegedly retaliatory Facebook comment and . . . Plaintiffs Nelson and Theresa Driver were not parties to the underlying [Contract] (in fact, Theresa Driver had/has no ownership interest in ARIS, the only Plaintiff who was party to the [Contract]) by Lester." (Doc. 19, p. 6). Plaintiffs counter that they were each injured by Defendants' actions and have standing because "[t]he County stopped paying ARIS under the contract" and "Theresa and Nelson relied on the income from the ARIS contract." (Doc. 25, p. 8).

Although not identified in the parties' briefing, controlling Eighth Circuit precedent dictates that Plaintiffs lack standing to bring claims against Defendants for free speech retaliation under § 1983 and the ACRA. Because Nelson contracted with the County through ARIS, a corporation, he and Theresa must show an injury that is non-derivative of the economic injury the County inflicted on ARIS. They fail to make this showing. As

8

for ARIS, there is no evidence that it engaged in expressive conduct for which it was retaliated against, and it cannot assert the free speech rights of Nelson and Theresa.

The Court begins with the Supreme Court's opinion in *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996). In *O'Hare*, the Court held that the First Amendment protections afforded to public employees extend to independent contractors who provide services to public entities. *Id.* at 726. John Gratzianna was the owner and operator of O'Hare Trucking Service, a corporate entity which provided towing services to the City of Northlake for many years. After Gratzianna refused to support the Northlake mayor's reelection bid and instead supported the mayor's opponent, the City ceased contracting with O'Hare Trucking Service. Gratzianna and O'Hare sued the City for First Amendment retaliation. The Court reversed the lower courts' dismissal of Gratzianna and O'Hare's claims and extended its prior decisions protecting the First Amendment rights of public employees, explaining that "[i]ndependent contractors, as well as public employees, are entitled to protest wrongful government interference with their rights of speech and association." *Id.* at 723.[5] The Court did not address Gratzianna or O'Hare's standing to sue.

---

[5] On the same day it issued its opinion in *O'Hare*, the Supreme Court also decided the companion case of *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 673 (1996). There, plaintiff Keen Umbehr was contracted by the defendant county to provide trash disposal. "[T]he contract between Umbehr and the County was automatically renewed annually unless either party terminated it by giving notice at least 60 days before the end of the year or a renegotiation was instituted on 90 days' notice." *Id.* at 671. Separate from his trash disposal work, "Umbehr was an outspoken critic of" the board of county commissioners. *Id.* The board eventually voted to terminate Umbehr's contract, allegedly due to his criticism of the board. The Court held that an independent contractor's contract cannot be terminated based on the contractor's political speech, subject to a balancing of the public entity's "legitimate interests as a contractor" against "the free speech interests at stake." *Id.* at 685.

9

Five years after *O'Hare*, the Eighth Circuit took up the antecedent question of whether an independent contractor has standing to sue a public entity for First Amendment retaliation. That case, *Potthoff v. Morin*, 245 F.3d 710 (8th Cir. 2001), controls the standing inquiry here and merits a detailed recitation.

In *Potthoff*, Roger Potthoff and ComReal Corporation brought suit against the Port Authority of the City of St. Paul, William Morin, and Hines Interests Limited Partnership. Hines and the Port Authority had entered into an agreement for Hines to manage a property owned by the Port Authority. Hines subcontracted the leasing rights for the Port Authority's property to ComReal, a corporation for which Potthoff was the sole shareholder. About a year later, "a local newspaper published an article in which Potthoff was quoted criticizing the Mayor of St. Paul regarding a matter involving municipal parking lots." *Id.* at 713. Morin, the manager of the Port Authority, allegedly called Potthoff and threatened that ComReal's leasing agreement would be canceled if Potthoff "did not recant and desist from such criticism of" the mayor. *Id.* A few days later, Hines informed Potthoff that Hines was terminating the leasing agreement at the direction of the Port Authority. Potthoff sued Morin in his individual capacity for violating Potthoff's free speech rights, among other causes of action.

The Eighth Circuit held that Potthoff lacked standing to sue Morin for violating Potthoff's First Amendment rights. The court reasoned that the entity injured by the Port Authority's termination of ComReal's contract was ComReal itself, not ComReal's shareholder Potthoff. The shareholder standing rule states that "actions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name even though the injury to the corporation may incidentally

10

result in the depreciation or destruction of the value of the stock." *Id.* at 716 (cleaned up). Therefore, the court held "that the shareholder standing rule applies to civil rights actions brought pursuant to 42 U.S.C. § 1983 by shareholders claiming injury to their corporations" and Potthoff could not claim ComReal's financial injury as his own. *Id.* at 717. The court further explained that "Potthoff's § 1983 claim can survive only if he has alleged that he personally has suffered a direct, nonderivative injury." *Id.* The court held that Morin attempting to silence Potthoff's protected speech was not a direct, nonderivative injury because "the deprivation of an abstract constitutional right is not justiciable unless a legally protectible interest is at stake." *Id.* at 718 (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986)).

The reader would be forgiven for raising an eyebrow at the result in *Potthoff* in light of the Supreme Court's holding in *O'Hare*. The Supreme Court held that independent contractors have the right to sue public entities for First Amendment retaliation. *Potthoff* hollows out that right for the many contractors—including the plaintiff in *O'Hare*—who create a business entity to facilitate their work and are the sole shareholders of that entity. To explain this incongruity, the *Potthoff* court simply noted that "[t]he distinction between the company and its owner-operator for purposes of applying standing rules was neither raised nor discussed" by the Supreme Court in *O'Hare*. *Potthoff*, 245 F.3d at 717 n.6. Incongruity aside, *Potthoff* is binding on this Court. *See Johnson v. City of Omaha*, 2022 WL 17961160, at *9 (D. Neb. Dec. 27, 2022) (applying *Potthoff* to dismiss for lack of standing the plaintiff's race discrimination claims against the City of Omaha because the plaintiff's financial injuries were derivative of the injuries to his business, which had contracted with the City).

11

Applying *Potthoff* to the facts here, the Court finds that no Plaintiff has standing to sue Defendants under the First Amendment or the ACRA. Nelson and Theresa engaged in protected First Amendment speech when they supported Jim House for County Judge and were financially injured when Defendants canceled ARIS's contract with the County. However, neither Nelson nor Theresa personally contracted with the County to provide services, and their injuries from the canceled contract are wholly derivative of the injuries to ARIS. Lester's threat to Nelson and Theresa's free speech rights is the same type of "deprivation of an abstract constitutional right" that was deemed an insufficient nonderivative injury in *Potthoff*. *Id.* at 718.[6]  ARIS—who was party to the Contract—is also a plaintiff in this case, but there is no allegation nor evidence that ARIS itself—as a corporate entity distinct from Nelson—engaged in protected speech for which it was retaliated against by Defendants. Just as in *Potthoff*, "When [Nelson] incorporated [ARIS], he relinquished the right to seek direct legal redress under § 1983 for injuries suffered by him as [ARIS's] sole shareholder and principal employee." *Id.* (citing *Kush v. American States Ins. Co.*, 853 F.2d 1380, 1384 (7th Cir. 1988)). That ARIS is a closely held S corporation does not change the result. *See In re AFY*, 734 F.3d 810, 820 (8th Cir. 2013) (acknowledging that "liability for an S corporation's taxes passes through the

---

[6] The Court notes that *Potthoff*'s treatment of harm to "abstract constitutional rights" as insufficient to establish a nonderivative injury is in tension with other caselaw that deems, for example, the chilling of speech to constitute a concrete injury. *See, e.g.*, *Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969, 973 (8th Cir. 2002) (holding that the wife of a city firefighter had standing to challenge a city charter provision barring city employees from involvement in politics because she was "injured by having to give up, or hesitating to exercise, her First Amendment rights" out of fear that her political activity would be attributed to her husband).

12

corporation to the shareholders" but nevertheless holding that the appellants lacked standing under the shareholder standing rule).

Accordingly, no Plaintiff has standing to sue Defendants under § 1983 or the ACRA, and the Court will not address the merits of those claims. However, there is no question that ARIS, as a party to the Contract with the County, has standing to sue the County for breach of contract, a point Defendants concede. See Doc. 19, p. 6 ("The result of any analysis would clearly indicate that the only Plaintiff with standing regarding the underlying CC is ARIS . . . ."). The Court turns to that remaining claim now.

### B. Breach of Contract

Under Arkansas law, "The county judge shall have the authority to enter into necessary contracts or other agreements to obligate county funds and to approve expenditure of county funds appropriated therefor in the manner provided by law." Ark. Code Ann. § 14-14-1102(b)(2)(C)(ii). "The construction and legal effect of a written contract are to be determined by the court as a question of law, except where the meaning of the language depends on disputed extrinsic evidence." *Pults v. City of Springdale*, 23 Ark. App. 182, 184 (1988) (citing *Ark. Rock & Gravel Co. v. Chris-T-Emulsion Co.*, 259 Ark. 807 (1976)).

The County admits that it unilaterally terminated the Contract in January 2022 without any default on the part of ARIS. However, the County insists there was no valid contract to breach at that point in time because the 2017 Contract's auto-renewal provision contains an error that makes it nonsensical and, even if that provision was not defective, it would be void under Arkansas law because it binds the County to a multi-year contract. The Court finds that, first, the typo in the auto-renewal provision can be

reformed based on mutual mistake of the parties and, second, the auto-renewal provision is valid because it is limited to Wood's tenure in office. Therefore, the Court denies the County summary judgment on ARIS's breach of contract claim.

### 1. *Mutual Mistake*

Washington County first argues that the errant "is" in the Contract's auto-renewal provision makes that provision defective, and therefore the term of the agreement was limited to 2017. The provision reads, "The term of this contract shall be from January 1, 2017 through December 31, 2017. However, **is** shall renew annually and automatically and include any pay increases approved by the Quorum Court, unless agreed to otherwise by the parties." (Doc. 2, p. 14 (emphasis added)). The Court finds that because the parties intended "is" to read "it," the provision is not defective, and the Court denies the County summary judgment on this basis.

Under Arkansas law, courts "will reform written instruments . . . [w]here there is a mutual mistake—that is, where an agreement was actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto." *Mikus v. Mikus*, 64 Ark. App. 231, 236–37 (1998) (collecting cases). "A mutual mistake is one that is reciprocal and common to the parties, each alike laboring under the same misconception in respect to the terms of the written instrument." *Id.* at 237. "Evidence of mutuality must relate to the time of the execution of the instrument and show that the parties then intended to say one thing and by mistake expressed another thing." *Id.* (citing *Yeargan v. Bank of Montgomery Cnty.*, 268 Ark. 752 (Ark. App. 1980)). "Whether mutual mistake warranting reformation occurred is a question of fact" that "must be supported by clear and convincing proof," though "the proof need

14

not be undisputed." *Lambert v. Quinn*, 32 Ark. App. 184, 187 (1990) (citations omitted). Reformation is an equitable remedy and is a question for the Court. *See Turner v. Pennington*, 7 Ark. App. 205, 208 (1983).

Here, the undisputed evidence shows that the Contract contains a mutual mistake and precludes summary judgment in the County's favor. The depositions of Nelson, Wood, and Lester show that both parties to the Contract intended that the contract would be automatically extended every year unless the parties agreed otherwise. This mutual understanding is the precise reason Lester and Wood asked Nelson to sign a revised agreement that would have allowed for unilateral termination. There is clear and convincing evidence that the "is" in the Contract's auto-renewal provision was a mutual mistake, and the parties intended that provision to read, "However, it shall renew annually and automatically . . . ." The Contract is so reformed.

### 2. Multi-year Contract

The County next argues that the Contract's auto-renewal provision "violate[s] several provisions of Arkansas law prohibiting multi-year contracts by counties." (Doc. 19, p. 10). The Court agrees that the auto-renewal provision may violate Arkansas law if it was construed to continue in perpetuity, but the parties' conduct informs the Court's construction of the Contract's auto-renewal provision and renders it limited to Wood's tenure in office.

"Multi-year contracts entered into by counties or cities are not *per se* unconstitutional." *Gov't Serv. Automation, Inc. v. Faulkner Cnty.*, 929 F. Supp. 338, 341 (E.D. Ark. 1995). However, the Arkansas State Constitution places certain limits on how

15

counties and cities manage their finances. Article 12, § 4 of the state constitution provides, in relevant part:

> The fiscal affairs of counties, cities and incorporated towns shall be conducted on a sound financial basis, and no county court or levying board or agent of any county shall make or authorize any contract or make any allowance for any purpose whatsoever in excess of the revenue from all sources for the fiscal year in which said contract or allowance is made; . . . .

Ark. Const. art. XII, § 4. "In other words, a [county] cannot enter into a contract for an amount that exceeds its annual revenue for a fiscal year." *Town of Lead Hill v. Ozark Mountain Reg'l Pub. Water Auth. of State*, 2015 Ark. 360, 4 (2015).

"[I]t is the County which bears the burden of showing that the contract[] in question [is] unconstitutional" under Article 12 of the state constitution. *Gov't Serv. Automation*, 929 F. Supp. at 341. Here, the County has failed to present any evidence of its annual revenue for 2017 to the present, and therefore the Contract cannot be invalidated under Article 12, § 4. *See id.* ("The County has not provided the Court with any evidence of what total Faulkner County revenues were in either 1992, the year in which the contracts were negotiated and signed, or 1993, the year the agreements were to take effect. Thus, there is no way for the Court to determine whether the amount the County was obligated to pay under the contracts exceeded county revenues in either year.").

Nevertheless, the Arkansas Supreme Court has separately suggested that a "municipality cannot bind itself by a perpetual contract, or by one which lasts an unreasonable length of time." *Am. Fed'n of State, Cnty. & Mun. Emps. v. City of Benton, Ark.*, 513 F.3d 874, 881 (8th Cir. 2008) (quoting *Lamar Bath House Co. v. City of Hot Springs, Ark.*, 229 Ark. 214, 315 S.W.2d 884, 886 (1958)). This makes the Contract here suspect, given that it could be read to renew every year in perpetuity and can only be

16

terminated upon default or mutual agreement of the parties. Plaintiffs seem to agree, as they did not respond to the County's argument that the Contract would be void if read to be perpetual.

When construing the meaning of a provision defining a contract's duration, the Court's inquiry focuses on the intent of the parties. *See Snowden-Jones v. Tucker*, 1991 WL 31219, at *4 (Ark. Ct. App. Mar. 6, 1991), *opinion supplemented on denial of reh'g*, 1991 WL 70712 (Ark. Ct. App. May 1, 1991). "The construction placed upon an agreement by the parties is an important, and often decisive factor in construing an instrument." *Hanna Oil & Gas Co. v. Taylor*, 297 Ark. 80, 82 (1988). In *Pults v. City of Springdale*, a lessee sued Springdale for breach of contract after the City notified the lessee that its lease for an airplane hangar would not be renewed. 23 Ark. App. at 184. "The lease was for a one year period but gave [the lessee] an option to renew 'for successive terms of one year.'" *Id.* at 183. The Arkansas Court of Appeals, noting that perpetual leases are disfavored, affirmed the trial court's construction of the renewal provision to be limited to just one renewal because the agreement lacked "peculiar language indicating that a perpetual lease was intended" and the context and parties' conduct did not otherwise show their intent for a perpetual lease. *Id.* at 187.

Here, the parties' 2014 Contract contained an auto-renewal provision nearly identical to that in the 2017 Contract. If the provision in the 2014 Contract was intended to continue beyond Judge Edwards's tenure in office, there would have been little need to re-sign the contract when Wood replaced Edwards in 2017. Yet both Nelson and Wood found it necessary to sign a new agreement. This indicates the parties understood the auto-renewal provision in the 2014 Contract to be limited to Judge Edwards's tenure in

17

office. When asked why he wanted to sign a new contract with Wood in January 2017, Nelson testified that he "just wanted to make sure it was still current and enforceable." (Doc. 20-2, p. 67). Moreover, the parties agreed by their conduct that the 2017 Contract automatically renewed in 2018, 2019, 2020, and 2021, during Wood's six years in office from 2017 to 2022. Therefore, the Court finds that the parties understood and intended the 2017 Contract to automatically renew only during Judge Wood's tenure in office. *Cf. Snowden-Jones*, 1991 WL 31219, at *3–4 ("Parties, by their conduct, can enable a court to give substance to an indefinite term of a contract.").

Based on this undisputed evidence, the Court construes the renewal term of the 2017 Contract to be limited to Wood's tenure in office, which concluded at the end of 2022. In other words, the Contract did not automatically renew in January 2023 when County Judge Patrick Deakins took office. Because the County ceased paying ARIS in January 2022, any damages for breach of contract would also be limited to 2022. ARIS's breach of contract claim, as modified herein, survives summary judgment.[7]

## IV. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (Doc. 18) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **GRANTED** in favor

---

[7] Because the Court limits the Contract to Wood's tenure in office, it need not address the County's argument that the Contract is invalid because "[a] Contract that requires the signature of the current County Judge on any contract obligating county funds and binds future County Judges to said contract; is per se invalid." (Doc. 19, p. 11 (all errors in original)). The Court notes, however, that the two Arkansas Supreme Court cases cited by the County do *not* say that such contracts are "per se invalid." *See Cleveland Cnty. v. Pearce*, 171 Ark. 1145 (1926) (holding that contracts signed by a former county judge "did not become invalid because of the change in the personnel of the individual holding the office of county judge"); *Watts & Sanders v. Myatt*, 216 Ark. 660, 662 (1950) ("It is established that an outgoing County Judge has authority to bind his successor contractually for the following year.").

Defendants Joseph Wood, Brian Lester, and Washington County on Counts I and II of the Complaint and **DENIED** on Count III of the Complaint. Counts I and II are **DISMISSED WITH PREJUDICE**.

    **IT IS SO ORDERED** on this 21st day of April, 2023.

                                                 _____
                                               TIMOTHY L. BROOKS
                                               UNITED STATES DISTRICT JUDGE